**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joel VITAL–PADILLA, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Simon CONTRERAS–CUEVAS, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rene Felix LOPEZ, Defendant-Appellant.**

**Nos. 73–3013 to 73–3015.**

United States Court of Appeals, Ninth Circuit.

July 12, 1974.

Michael S. Evans, San Diego, Cal., for Joel Vital-Padilla.

William Duerksen, San Diego, Cal., for Simon Contreras-Cuevas.

J. A. Crawford, San Diego, Cal., for Rene Felix Lopez.

Richard Strauss, Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before DUNIWAY and CHOY, Circuit Judges, and TAYLOR,* District Judge.

## OPINION

DUNIWAY, Circuit Judge:

Appellants were convicted in a jury trial of conspiracy to smuggle and transport aliens, and of smuggling and transporting aliens not lawfully entitled to enter or to reside in the United States.

Two cars traveling in tandem on De-Luz Canyon Road about sixty miles from the Mexican-U.S. border were stopped by border patrol agents and the aliens were found in the cars. We conclude that the stop of both cars was based upon a founded suspicion. Absent a founded suspicion the stop would have been illegal under Almeida-Sanchez v. United States, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 and United States v. Peltier, 9 Cir., 1974, in banc, 500 F.2d 985. We also conclude that the stop produced probable cause to arrest all three defendants.

### 1. Founded Suspicion.

Stated in a light most favorable to the government, the trial judge having found that there was a founded suspi-

* The Honorable Fred M. Taylor, United States District Judge for the District of Idaho, sitting by designation.

cion justifying the stop, these are the facts.

On May 4, 1973, two Border Patrol Agents were stationed on an abandoned side road 200 feet back from and forty feet above and overlooking DeLuz Canyon Road. That road leaves Highway 395, a main road from the south, near Fallbrook, which is four or five miles to the west of the highway and about fourteen miles to the south and west of the point where the officers were, and comes out on Highway 71, about five miles to the north of the same point. The road by-passes a fixed immigration checkpoint at Temecula on Highway 395. The first few miles of the road out of Fallbrook are paved. Thereafter it becomes a dirt road. The dirt portion is a single lane road, winding and dusty, washed out by rain, rutted and with chuckholes, and at some points so narrow that cars going in opposite directions cannot pass. Going north from about eight miles north of Fallbrook there are no houses or ranches on the road. The officers' lookout was about sixty air miles and eighty road miles from the Mexican border. Because the road by-passes the checkpoint, it is frequently used by smugglers. It was the officers' intention to stop every car coming from the direction of Fallbrook, except possibly cars with drivers known to them to be local people.

The officers' view of the road extended between one-half mile and a mile, to a point where it disappeared around a curve. The hour was 7:50 p. m., the sun had set, and it was dusk where the officers were and getting "quite dark" in the canyon. At that time, the officers saw a cloud of dust approaching around the curve. As it came nearer, they could see two cars approaching—a red Ford Mustang followed by a black Toyota Land Cruiser some thirty or forty yards behind. Neither vehicle had its lights on. Both were traveling at about forty miles an hour—about double what the officers thought to be a safe speed on that road. They also considered the close proximity of the cars to each other to be dangerous. They suspected that the cars were engaged in smuggling, using the "lead car-load car" procedure that we have discussed in United States v. Larios-Montes, 9 Cir., 1974, 500 F.2d 941. They testified that this procedure is frequently used on the road.

Agent McAda drove his car behind the Mustang and turned on his red light. The Mustang speeded up a little, then stopped after about one-fourth mile. The driver was Contreras, and Vital was a passenger. Both produced papers that convinced McAda that they were immigrants lawfully in this country. Both disclaimed any connection with the Toyota; both denied that they knew that it was following them. A search of the car and their belongings produced nothing incriminating.

Meanwhile, Agent Walters had made a similar stop of the Toyota. Lopez was the driver. One alien sat next to him and five more were in a space behind the seat. All except Lopez were unlawfully in this country. Lopez is a United States citizen. Walters arrested them all. Nothing that Walters then learned in any way directly incriminated Contreras or Vital. He told McAda, by radio, that he had found six "illegal" aliens in the Toyota. McAda then arrested Contreras and Vital.

■ While we continue to be of the opinion that there is nothing suspicious about two cars going at the same ordinary speed, and at a safe distance apart, upon a highway late at night (see United States v. Laurios-Montes, *supra*), we find the facts here quite different. Here was a remote, little traveled, rough, narrow winding road, with two cars traveling at a high speed and too close together, in the dark and with no lights on. The road was known to be used by smugglers, and by hardly anyone else. One of the officers testified that about the only other cars he had seen on the road were those of tourists who were lost. Surely these facts, plus knowledge of the "lead car-load car" procedure and its use on this road would create in the minds of the officers a well-founded suspicion that illegal activi-

ty was afoot. We conclude that the stop of both cars was justified.

■ It is no answer to say that it was the officers' intention to stop every car that came along, regardless of other circumstances. The validity of stops and searches and arrests is determined by an objective, not subjective, standard. Terry v. Ohio, 1968, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889; United States v. Jit Sun Loo, 9 Cir., 1973, 478 F.2d 401, 404; United States v. Mallides, 9 Cir., 1973, 473 F.2d 859, 861. Thus, even if officers erroneously rely upon a specific doctrine or presumption as entitling them to make a search or arrest, their action will still be sustained if it was objectively justifiable on other grounds. Smith v. United States, 9 Cir., 1968, 402 F.2d 771, 772; White v. United States, 8 Cir., 1971, 448 F.2d 250, 254. Accordingly, even though the officers improperly relied upon their supposed authority to stop every vehicle on the road, see United States v. Brignoni-Ponce, 9 Cir., 1974, in banc, 499 F.2d 1109 they had facts within their knowledge amounting to a founded suspicion such as to make these particular stops constitutional and the stops must be upheld.

### 2. Probable Cause.

■ The arrest of Lopez was clearly valid. The stop turned up ample evidence against him without a search, and provided probable cause for his arrest.

■ In the cases of Contreras and Vital, however, the situation is different. The lead car-load car procedure, in conjunction with the other facts known to the officers before the stop, did give rise to a founded suspicion, but they did not supply probable cause. The stops produced no additional specific knowledge about Contreras and Vital. The

discovery of the aliens in the load car, however, fully confirmed McAda's founded suspicions. He then knew that a crime had been committed, and he had reasonable cause to believe that Contreras and Vital were engaged, along with Lopez, in committing it. Cf. McNeary v. Stone, 9 Cir., 1973, 482 F.2d 804, 807; United States v. McDowell, 9 Cir., 1973, 475 F.2d 1037, 1039–1040.

■ The aliens and the defendants were taken to the Temecula checkpoint.[1] There the agents interviewed the aliens and were told by them that a person unknown guided them across the border and brought them, in a white car, to a grove of trees where they hid for half the night and a day. Then both the red Mustang and the black Toyota arrived. They were put in the Toyota and the two cars started out together, the Toyota following the Mustang. They proceeded in this manner until they were caught. After the agents received this information, Vital's wallet was searched and a paper was found showing that he owned the Toyota. The search was a valid one, United States v. Robinson, 1973, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427, and would have been valid without the foregoing additional information, which merely strengthened the probable cause that the officers already had.[2]

### 3. Sufficiency of the Evidence.

At the trial, the government produced one of the "illegal" aliens, the one who sat in the seat with Lopez. On direct, he did not testify about the arrival of the Mustang—only that of the Toyota—nor did he give any testimony to the effect that the two cars left together, the Toyota following the Mustang. On the contrary, he mentioned only the Toyota

1. It was not only reasonable to arrest Vital and Contreras but the officer really had little choice. The proper course after their apprehension in the middle of nowhere was to fully investigate into the crime before deciding whether anyone should be released. Yet it would be unreasonable to require two officers to interrogate nine men in the open; they needed the security of the border patrol station. See United States v. McDowell, supra.

2. We note that in any event Contreras has no standing to attack the search of Vital. See Jones v. United States, 1960, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697; Brown v. United States, 1973, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208; Alderman v. United States, 1969, 394 U.S. 165, 171–176, 89 S.Ct. 961, 22 L.Ed.2d 176; United States v. Carrion, 9 Cir., 1972, 463 F.2d 704, 706; Diaz-Rosendo v. United States, 9 Cir., 1966, in banc, 357 F.2d 124, 130.

and did not mention the Mustang at all. On cross-examination by counsel for Vital, the witness denied that he had ever seen either the Mustang or Vital or Contreras until after the arrests. He didn't even see a cloud of dust ahead. It was then stipulated that each of the other aliens, if called to the stand, would give testimony "identical in all respects" to that of the testifying alien. Vital argues that the evidence is insufficient to sustain his conviction. Contreras does not.

In spite of the failure of the aliens' testimony to tie Vital or Contreras more directly to the offenses, we conclude that the evidence is sufficient, although no more than sufficient, to sustain the conviction of both of them. The lead car-load car procedure and the facts leading to the arrest were fully testified to by the agents. When there is added the facts that Vital owned the Toyota and that Contreras was driving him in the Mustang, the jury, which was fully instructed that it must find them guilty beyond a reasonable doubt, could reasonably infer that both were a part of a conspiracy to transport the aliens and that both were participating in the actual transportation.

Affirmed.