**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ruben NUNEZ–VILLALOBOS, aka Aniceto Verduzco-Salazar, Defendant-Appellant.**

**No. 73–3534.**

United States Court of Appeals, Ninth Circuit.

July 12, 1974.

Robert L. Boles (Argued) Federal Defenders, Inc., San Diego, Cal., for defendant-appellant.

Richard Strauss, Asst. U. S. Atty. (Argued), San Diego, Cal., for plaintiff-appellee.

Before DUNIWAY and GOODWIN, Circuit Judges, and BURNS,* District Judge.

OPINION

DUNIWAY, Circuit Judge:

Nunez-Villalobos challenges his conviction of possession of marijuana with the

---

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

intent to distribute it on the grounds that the stop of his pickup truck violated the Fourth Amendment. We affirm.

The trial judge held that the stop was justified because the officer who made the stop had a founded suspicion about Nunez's conduct, and that the seizure of the marijuana was justified because it was in plain view.

Stated most favorably to the government, the following facts were brought out during the hearing of Nunez's motion to suppress. At 2:00 a. m. on August 5, 1973, Border Patrol Agent Gilbert was stationed at Campo Border Patrol Station where he was patrolling the Tecate area. The Tecate area is a hilly area with rugged terrain located approximately one mile from the Mexican border. The area is known to have a high degree of smuggling activity. It is sparsely populated. Highway 94 runs through this area, and the traffic on it is ordinarily extremely light after midnight.

At approximately 2:05 a. m., Gilbert was turning left (west) onto Highway 94 when he "had a Chevrolet pickup go through [his] headlights proceeding eastbound on Highway 94." Approximately ten to fifteen minutes later Gilbert was going east on Highway 94 returning to the Border Patrol Station when "the same Chevrolet pickup passed [him] westbound." He then made a U-turn and stopped the pickup. He did so for the following reasons:

It's my experience, at this time of night, on Highway 94, and the smuggling activity, everything here fit the typical cases I am familiar with.

The unusual thing, in my opinion, was, I did not recognize the vehicle as any local, plus the fact that I had seen it traveling in both directions in a very short period of time.

I knew during this period of time that there was no place they could have gone that would have been open . . . I had reason to believe that he picked up something.

Gilbert testified that a common smuggling technique was to come from a city, pick up something or somebody and return to the city. He said that approximately 80% of the "cases made in this particular area" involved a car first seen traveling in one direction and later seen traveling in the opposite direction. He also testified that in 80% of these cases the final destination of the cars is westbound (as here), as there are no heavily populated areas within a hundred miles to the east.

Gilbert parked his car directly behind the pickup, with his lights shining on the pickup. In the bed of the pickup he saw a duffelbag which was open and in which he could see cellophane wrapped packages. From his experience he concluded that the packages contained marijuana.

Neither the early hour in the morning nor the fact that Nunez did not appear to be a "local," nor both together, could justify the stop. It is not a suspicious circumstance for a person, even a stranger, to drive on a highway at 2:00 a. m. We think, however, that the late hour plus the driving west into a border area where there is no place to go and promptly returning from it, plus the officer's knowledge that such actions often betoken smuggling, do give an officer a basis for suspicion that unlawful activity is taking place. Smuggling is likely to occur under cover of darkness and when the risk of being seen making a "pickup" at a "drop" are minimized because there is little or no traffic.

Although this case arose in a remote, almost empty, rural area, while the stop in Wilson v. Porter, 9 Cir., 1966, 361 F. 2d 412, 414–415, occurred in an urban setting, that case and this one are strikingly similar. See also United States v. Jaime-Barrios, 9 Cir., 1974, 494 F.2d 455; United States v. Bugarin-Casas, 9 Cir., 1973, 484 F.2d 853.

The stop being justified, so that the officer was in a lawful position from which to see, the "plain view" doctrine justified seizure of the contraband. See the discussion in United States v. Basurto, 9 Cir., 1974, 497 F.2d 781, 787 to 788.

Affirmed.

BURNS, District Judge, dissents.